**Thomas J. CRAY, Plaintiff,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.**

**No. 99–CV–6370L.**

United States District Court, W.D. New York.

March 29, 2001.

172

Steven A. Maas, Kaman, Berlove, Marafioti, Jacobstein & Goldman, Rochester, NY, for plaintiff.

John F. Pfeifer, Pinsky & Skandalis, Syracuse, NY, for defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

### INTRODUCTION

Plaintiff, Thomas J. Cray, commenced this action in New York State Supreme Court, Monroe County, on July 22, 1999. Defendants (collectively referred to as "Nationwide"), removed the action to this court on August 25, 1999. Jurisdiction in this court is premised on diversity of citizenship pursuant to 28 U.S.C. § 1441(a).

In brief, the complaint alleges that plaintiff was formerly a Nationwide insurance agent, and that he was terminated by Nationwide in June 1999. He alleges that after his termination, he requested that he be paid certain deferred compensation and "extended earnings" to which he was entitled under the terms of his agency agreement, and that Nationwide refused. The complaint asserts a number of causes of action under New York law.

Defendants answered the complaint on August 30, 1999. The answer also asserts several counterclaims, all of which are based on plaintiff's alleged retention and use of customer lists and related information obtained while he was a Nationwide agent.

Plaintiff has moved for summary judgment on all his claims, and seeks dismissal of defendants' counterclaims. Defendants have cross-moved for summary judgment dismissing the complaint and directing plaintiff to return to Nationwide the customer lists and related documents.

## FACTUAL BACKGROUND

The parties entered into an "Agent's Agreement" ("the Agreement") on or about February 4, 1995. The Agreement provided, *inter alia*, that plaintiff would be "an independent contractor for all purposes," and "not an employee." Complaint Ex. A ¶ 1. It further provided that plaintiff would "represent [Nationwide] exclusively in the sale and service of insurance," meaning that he would "not solicit or write policies of insurance in companies other than" Nationwide without Nationwide's consent. *Id.* ¶ 3.

Paragraph 11 of the Agreement, which deals with "Agency Security Compensation," lies at the heart of the present dispute. Paragraph 11(a), entitled "Computation of Deferred Compensation Incentive Credits," provides that each year, a specified percentage of plaintiff's "Deferred Compensation Incentive Credits" ("DCIC"), which were defined as plaintiff's "annual original and service fee earnings," would be credited to plaintiff's account. Paragraph 11(b) provides that when plaintiff qualified for DCIC, he would also qualify for "extended earnings payable upon qualified cancellation of [the] Agreement." That section states that upon "qualified cancellation" of the Agreement, plaintiff would be paid a specified percentage of an amount equal to the renewal services fees (less certain excepted amounts) paid to plaintiff by Nationwide for the twelve months immediately preceding the cancellation. The Agreement states, "Unless you [*i.e.*, plaintiff] have induced or attempted to induce, either directly or indirectly, policyholders to lapse, cancel, or replace any insurance contract in force with [Nationwide], the cancellation of this Agreement shall be a qualified cancellation for the purpose of this Agreement." *Id.* ¶ 11(e).

Paragraph 11(f), however, provides that Nationwide's liability for Agency Security Compensation would terminate upon the occurrence of any one of several events or circumstances, including: plaintiff's acting as an insurance agent or having any connection with the insurance business within one year following the cancellation of the Agreement, and within a twenty-five-mile radius of plaintiff's business location at the time of cancellation; plaintiff's failure to return within ten days all records and supplies furnished to him by Nationwide during the course of the Agreement; or plaintiff's inducing or attempting to induce policyholders to lapse, cancel or replace any insurance contract in force with Nationwide, or his furnishing any other person or organization with the name of any Nationwide policyholder as to facilitate the solicitation by others of any policyholders.

Another document relevant to the issues in this case is a form entitled "Request for Letter of Authority" dated September 17, 1996. It states that plaintiff was requesting authority to place with companies other than Nationwide insurance coverages that were unacceptable to, declined by, or cancelled by Nationwide. The letter stated, *inter alia*, that plaintiff "agree[d] to maintain current records of all insurance policies placed and [to] make these policies and records available for review by Nationwide management." Plaintiff's Motion for Summary Judgment, Ex. I.

By letter dated June 9, 1999, Nationwide Sales Manager Robert Colwell informed plaintiff that Nationwide was cancelling the Agreement and terminating plaintiff as an agent. The letter did not state the reason for the cancellation. Colwell did state, however, "I am calling your attention to the provisions in paragraphs 11e and 11f of the 'Agents Agreement' which you signed. These provisions will be enforced, if applicable." Complaint Ex. B.

In addition, a document entitled "Agent Agreement Cancellation," which was signed by Colwell on June 8, 1999, and which defendants produced during discovery in this action, states the following reasons for the cancellation: "Soliciting of Nationwide policyholders from another active Nationwide agent. Violation of Paragraph 4 of the Agents Agreement Exclusive Representation. Violation of the Nationwide Brokerage Policy. Violation of item #2 in the Brokerage Letter of Authority. Agent refused to allow Sales Manager to review brokerage files." Plaintiff's Motion, Ex. H.

In a letter to Nationwide dated July 1, 1999, plaintiff's attorney made a formal demand "for an accounting of all moneys due and owing to Thomas J. Cray as commissions, deferred compensation and extended earnings, together with payment of all moneys due and owing to Mr. Cray within five (5) business days." Complaint Ex. D. It does not appear that Nationwide ever responded in writing, but it is undisputed that Nationwide did not comply with plaintiff's request.

The complaint contains six causes of action, for: (1) an accounting of the monies owed to plaintiff by defendants; (2) specific performance of the Agreement; (3) breach of contract; (4) unjust enrichment; (5) a declaratory judgment; and (6) defamation.[1] Defendants have asserted counterclaims for: (1) breach of the Agreement by plaintiff; (2) misappropriation of trade secrets; (3) unjust enrichment; (4) breach of fiduciary duty; and (5) conversion. Plaintiff seeks damages in the amount of $156,719, the amount he alleges is owed to him, plus interest.

The counterclaims are based on defendants' allegations that during his tenure with Nationwide, plaintiff engaged in brokering insurance for companies other than Nationwide, induced Nationwide policyholders to cancel their policies, and misappropriated customer lists and other proprietary information from his employment at Nationwide. Defendants request $500,000 in damages.

## DISCUSSION

### I. Summary Judgment—General Standards

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and all ambiguities and inferences that may be reasonably drawn from the facts must be viewed in the light most favorable to the non-moving party. *Coach Leatherware Co. v. Ann-Taylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991). To defeat a motion for summary judgment, the non-moving party must go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

---

1. At oral argument on the parties' motions, plaintiff's counsel stated that plaintiff is not pursuing the defamation claim, which is based on certain letters sent by Nationwide to plaintiff's former clients that allegedly impugned plaintiff's competency. The court will therefore deem this claim to have been withdrawn.

The fact that both sides have moved for summary judgment does not necessarily mean that one or the other of them is entitled to summary judgment, or that there are no material facts in dispute. Where both sides have moved for summary judgment, each party's motion must be evaluated on its own merits, and all reasonable inferences must be drawn against the party whose motion is under consideration. *Schwabenbauer v. Board of Educ. of Olean,* 667 F.2d 305, 314 (2d Cir.1981); *see, e.g., BBS Power Mod, Inc. v. Prestolite Elec., Inc.,* 71 F.Supp.2d 194, 202 (W.D.N.Y.1999) (denying both sides' motions for summary judgment on ground that material issues of fact existed); *MacMillan v. Provident Mut. Life Ins. Co. of Philadelphia,* 32 F.Supp.2d 600, 615 (W.D.N.Y.1999) (same).

## II. Plaintiff's Alleged Breach of the Agreement

After reviewing the record in the case at bar, I find that there are genuine issues of material fact that preclude the entry of summary judgment in favor of either plaintiff or defendants. In a nutshell, there are disputes concerning whether Nationwide's cancellation of the Agreement was a "qualified cancellation" entitling plaintiff to receive his agency security compensation, and whether plaintiff breached the terms of the Agreement and the Letter of Authority by misappropriating trade secrets, engaging in unauthorized brokering for third parties, or inducing or attempting to induce Nationwide policyholders to switch to a different insurance company.

■ ▪ One of the most obvious disputes here concerns the nature of the documents or files taken by plaintiff. Plaintiff contends that these documents contain only basic, general information such as names, addresses, dates of birth, claims history,

etc., much of which is obtainable from independent sources such as the Comprehensive Loss Underwriting Exchange ("CLUE"). Nationwide, on the other hand, maintains that these materials contain a wealth of information gathered about individual policyholders over a period of months or years, including appraisal reports, property photographs, police reports, risk-related information, and so on. Nationwide alleges that this information is held in strict confidence, and that all its agents are made aware that such information is not to be divulged to anyone. Defendants deny that this information is obtainable from outside sources, and contend that it represents the fruits of many hours of work by its agents.

■ In determining whether information qualifies as a trade secret, courts generally consider the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken by the business to guard secret information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *BBS Power Mod,* 71 F.Supp.2d at 202; *Wiener v. Lazard Freres & Co.,* 241 A.D.2d 114, 123, 672 N.Y.S.2d 8 (1st Dep't 1998); Restatement of Torts, § 757, comment b.

There is case authority that in general, an insurance company's customer lists are not considered to be trade secrets or confidential customer information. *See, e.g., Arnold K. Davis & Co. v. Ludemann,* 160 A.D.2d 614, 615, 559 N.Y.S.2d 240 (1st Dep't 1990); *Levine v. Bochner,* 132 A.D.2d 532, 517 N.Y.S.2d 270 (2d Dep't

1987). Courts have also held, however, that "where a company's customers are not readily ascertainable, but must be cultivated with great effort and secured through the expenditure of considerable time and money, the names of those customers are protectable trade secrets." *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F.Supp. 547, 556–57 (E.D.N.Y.1995) (collecting cases); *see also In re UFG Int'l, Inc.*, 225 B.R. 51, 57 (S.D.N.Y.1998) ("when the customer information is not readily ascertainable and includes information obtained from past dealings, such as insurance coverage amounts and premium amounts, it may constitute confidential information") (citing *John Hancock Mut. Life Ins. Co. v. Austin*, 916 F.Supp. 158, 164–165 (N.D.N.Y.1996)). In addition, it has been held that a "physical taking of customer lists ... might give rise to a breach of fiduciary duty," even if those lists do not constitute trade secrets or confidential information. *UFG Int'l*, 225 B.R. at 57.

In addition, the Second Circuit has stated that "[t]he question of whether or not a customer list is a trade secret is generally a question of fact." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir.1991); *see also* 1 R. Milgrim, Milgrim on Trade Secrets § 2.03 at 2–47 to 2–49 (1990) ("existence of a trade secret is a question of fact for the determination of the trier of fact, secrecy being a basic element") (quoted in *A.F.A. Tours*, 937 F.2d at 89). A number of courts have denied motions for summary judgment on the ground that issues of fact existed concerning whether particular information (including customer lists) constituted a trade secret. *See, e.g., BBS Power Mod*, 71 F.Supp.2d at 202; *Ivy v. Kilgore*, No. 97 CIV. 128, 1998 WL 633689 *7, 1998 U.S. Dist. LEXIS 14446 *21 (S.D.N.Y. Sept. 15, 1998); *Harbor Software, Inc. v. Applied Sys., Inc.*, 887 F.Supp. 86, 90 (S.D.N.Y.1995); *Spectron Glass and Electronics, Inc. v. Marianov-*

*sky*, 273 A.D.2d 374, 710 N.Y.S.2d 916 (2d Dep't 2000); *U.S. Reinsurance Corp. v. Humphreys*, 240 A.D.2d 264, 667 N.Y.S.2d 2 (1st Dep't 1997); *see also Cool Insuring Agency, Inc. v. Rogers*, 125 A.D.2d 758, 760–61, 509 N.Y.S.2d 180 (3d Dep't 1986) (reversing grant of preliminary injunction enforcing insurance agent's restrictive covenant, in part because plaintiff's allegation that customer files contained extensive confidential information was "sharply contested as a factual matter" by defendant), *appeal dismissed*, 69 N.Y.2d 1037, 517 N.Y.S.2d 1030, 511 N.E.2d 89 (1987).

In the case at bar, the parties clearly dispute the exact nature of the materials allegedly taken by plaintiff, particularly how much effort was involved in obtaining the information, and how difficult it would be to obtain that information from CLUE or similar sources. The two sides present sharply contrasting pictures in that regard, and it would be improper for the court at this stage to decide as a matter of law whose version is correct.

There is also some dispute about whether plaintiff breached the Agreement prior to its cancellation. For example, Colwell states in an affidavit that he learned that plaintiff had been engaging in "pink slipping" at Nationwide, meaning that plaintiff was soliciting policyholders that were already being serviced by another Nationwide agent pursuant to authority granted to the other agent by Nationwide. Colwell states that plaintiff continued pink-slipping even after Colwell had informed him and his fellow agents that such activity would not be tolerated. Affidavit of Robert W. Colwell, dated Aug. 17, 2000, ¶¶ 15–19.

Colwell also states that in late Spring or early Summer 1999, he learned that one particular policyholder, B & D Pump & Tank, Inc. ("B & D") had canceled its Nationwide policy, and that B & D had

obtained new insurance with a different company through plaintiff's agency. Colwell Aff. ¶¶ 20–21.

Plaintiff flatly denies these allegations. He states that prior to the cancellation of the Agreement, he never solicited Nationwide policyholders from other Nationwide agents, nor did he induce anyone to cancel a Nationwide policy. Affidavit of Thomas J. Cray, dated June 29, 2000 ¶ 7; Reply Affidavit of Thomas J. Cray, dated September 18, 2000 ¶ 3.

Again, these conflicting allegations present obvious issues of fact, the resolution of which may require live testimony and assessments of credibility by the finder of fact. Accordingly, summary judgment is not appropriate.

### III. Enforceability of the Forfeiture Provision

Plaintiff also contends that, regardless of whether he breached the terms of the Agreement as alleged by defendants, Paragraph 11(f) of the Agreement, which provides for forfeiture of Agency Security Compensation in the event of plaintiff's breach of any of the terms of that paragraph, is unenforceable as a matter of law. Plaintiff contends that this provision reflects defendants' awareness that under New York law, covenants not to compete are disfavored and rarely upheld. Plaintiff claims that Paragraph 11(f) is an attempt to end-run that judicial policy by wording this clause in such a way that while it does not literally forbid plaintiff from competing with Nationwide following the cancellation of the Agreement, it imposes such a harsh penalty-forfeiture of substantial earned compensation-that it achieves the same result.

In support of these assertions, plaintiff relies principally on the New York Court of Appeals' decision in *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d 84, 421 N.Y.S.2d 847, 397 N.E.2d 358 (1979). In *Post*, two account executives sued their former employer to recover pension benefits. The employer contended that the plaintiffs had forfeited the benefits when, after their termination without cause, they began working for a competitor. The Court of Appeals reversed the lower court's order granting summary judgment for the defendants, holding that "where an employee is involuntarily discharged by his employer without cause and thereafter enters into competition with his former employer, and where the employer, based on such competition, would forfeit the pension benefits earned by his former employee, such a forfeiture is unreasonable as a matter of law and cannot stand." *Id.* at 89, 421 N.Y.S.2d 847, 397 N.E.2d 358. In reaching that holding, the court reasoned that "[w]here the employer terminates the employment relationship without cause, ... his action necessarily destroys the mutuality of obligation on which the covenant rests as well as the employer's ability to impose a forfeiture. An employer should not be permitted to use offensively an anticompetition clause coupled with a forfeiture provision to economically cripple a former employee and simultaneously deny other potential employers his services." *Id.* Subsequent cases have extended *Post*'s holding to forfeiture of earned wages (including commissions), *see, e.g., Weiner v. Diebold Group, Inc.*, 173 A.D.2d 166, 167–68, 568 N.Y.S.2d 959 (1st Dep't 1991), but not to bonuses or other benefits payable at the discretion of the employer, such as stock options. *Id.; International Bus. Machines Corp. v. Martson*, 37 F.Supp.2d 613, 617 (S.D.N.Y.1999).

By its own wording, however, the court's holding in *Post* was limited to cases involving termination *without cause*. In the case at bar, defendants allege that plaintiff

was terminated for cause: his violation of the Agreement. Plaintiff has presented no authority, nor has the court discovered any, indicating that New York courts have extended, or would extend, the rule enunciated in *Post* to situations involving termination for cause, and the authority that does exist is to the contrary. *See, e.g., Gismondi, Paglia, Sherling, M.D., P.C. v. Franco,* 104 F.Supp.2d 223, 233 (S.D.N.Y. 2000) (since defendant was terminated for cause, plaintiff employer could seek to enforce non-compete clause); *UFG,* 225 B.R. at 56 (termination for cause "is required under New York law if an employer desires to enforce a restrictive covenant following involuntary termination of an employee"); *MTV Networks v. Fox Kids Worldwide, Inc.,* No. 605580/97, 1998 WL 57480 * 8, 1998 N.Y. Misc. LEXIS 701 *23 (New York County Feb.4, 1998) (defendant was properly terminated for cause, and employer was therefore entitled to injunctive relief under non-compete provision of employment contract).

■ Indeed, a contrary result would make little sense, and would be inconsistent with the reasoning behind the "employee choice doctrine," which provides that "an employee who receives benefits conditioned on not competing with the conferring employer has the choice of preserving his benefits by refraining from competition or risking forfeiture of such benefits by exercising his right to compete." *Kristt v. Whelan,* 4 A.D.2d 195, 199, 164 N.Y.S.2d 239 (1st Dep't 1957), *aff'd,* 5 N.Y.2d 807, 181 N.Y.S.2d 205, 155 N.E.2d 116 (1958). Just as an employer should not be able to use a non-compete agreement offensively by terminating an employee without cause and then using the agreement both to deny the employee earned compensation or benefits, and to prevent him from engaging in his chosen livelihood, so an employee should not be permitted to violate the terms of his employment contract, thereby giving the employer just cause for terminating him, and yet still be allowed both to compete with, and still collect benefits from, the former employer after his termination.

■ In the case at bar, plaintiff denies that he was terminated for cause, but as already explained, that factual issue is in dispute and cannot be resolved on these motions for summary judgment. *See Borne Chem. Co. v. Dictrow,* 85 A.D.2d 646, 649, 445 N.Y.S.2d 406 (2d Dep't 1981) ("As resolution of this issue [*i.e.,* whether defendant had been fired for cause] is critical to the determination of whether the covenant against competition should be enforced, it should be fully litigated upon remand"). The point is that the mere fact that the Agreement provides for forfeiture of Agency Security Compensation under certain circumstances does not render that provision invalid as a matter of law under *Post.* If it is ultimately determined that plaintiff was terminated without cause, he may yet prevail on his claim for that compensation, but I do not find the forfeiture provision to be invalid as a matter of law.

■ To the extent that the forfeiture provision limits plaintiff's ability to compete with defendants without forfeiting his Agency Security Compensation, however, that provision must be reasonable in temporal and geographic scope. *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 70 (2d Cir.1999). I find, however, that the restrictions here-no competition for one year within a twenty-five-mile radius of plaintiff's business location at the time of cancellation-are reasonable, as have other courts construing the same Agreement. *See Keding v. Nationwide Ins. Cos.,* No. 95–CV–25, 1997 WL 698036 * 3, 1997 U.S. Dist. LEXIS 17739 *11 (N.D.N.Y. Oct. 31, 1997); *Hamilton Ins. Servs., Inc. v. Na-*

*tionwide Ins. Cos.*, 86 Ohio St.3d 270, 275, 714 N.E.2d 898 (1999).

■ Plaintiff also contends that the forfeiture provision amounts to an unenforceable penalty. Under New York law, "parties to an agreement may provide for the payment of liquidated damages upon its breach, and such damages will be upheld if (1) the amount fixed is a reasonable measure of the probable actual loss in the event of breach, and (2) the actual loss suffered is difficult to determine precisely. However, if the liquidated damages do not bear a reasonable proportion to the loss actually sustained by a breach, they will constitute an unenforceable penalty." *Willner v. Willner*, 145 A.D.2d 236, 239–240, 538 N.Y.S.2d 599 (2d Dep't 1989); *see also Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977) ("a provision which requires, in the event of contractual breach, the payment of a sum of money grossly disproportionate to the amount of actual damages provides for penalty and is unenforceable").

■ Thus, "[i]n order to find that a penalty has been imposed, . . . it must first be determined that the complaining party has breached a contract and that a fixed sum, which bears no reasonable relation to the nonbreacher's actual loss, has been designated as the compensation which must be paid." *Jacobs v. Citibank, N.A.*, 61 N.Y.2d 869, 872, 474 N.Y.S.2d 464, 462 N.E.2d 1182 (1984). In the case at bar, however, the forfeiture of Agency Security Compensation is not contingent upon a breach of the contract. Pursuant to the.

Agreement, the agent is free to compete with Nationwide, regardless of time or place restrictions, without being in breach of the contract. Nationwide could not, for example, bring an action for breach of contract against plaintiff simply because he is competing with Nationwide; the only consequence of plaintiff's competition is that he forfeits his Agency Security Compensation. Whether that forfeiture is permissible under the facts of this case remains to be seen, depending upon whether plaintiff was terminated for cause and the other issues set forth above. I do not believe, however, that the forfeiture provision constitutes an unenforceable penalty under New York law.[2]

## CONCLUSION

Plaintiff's motion for summary judgment (Docket Item 9) and defendants' cross-motion for summary judgment (Docket Item 12) are both denied, except that the Sixth Cause of Action for Defamation is withdrawn and dismissed.

IT IS SO ORDERED.

---

**2.** I also note that there is some suggestion in defendants' papers that the instant suit was brought prematurely because under the Agreement, Agency Security Compensation payments do not become due until 60 days after cancellation of the Agreement, and plaintiff commenced this action 38 days after cancellation. There is no dispute, however, that defendant has consistently taken the position that plaintiff is not entitled to such payments at any time, so I do not find that this provides any basis for dismissal of the complaint.